STATE of Missouri,
Plaintiff–Respondent,

v.

Charles McKINNEY,
Defendant–Appellant.

No. 52421.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 10, 1989.

Steven R. Ohmer, Asst. Cir. Atty., St. Louis, for plaintiff-respondent.

Daniel R. Devereaux, St. Louis, for defendant-appellant.

SIMON, Judge.

In this court-tried case, defendant, Charles McKinney, was charged with three counts of promoting pornography in the second degree in violation of § 573.030 RSMo (1978) and one count of illegal possession of marijuana, a Schedule I controlled substance, in violation of § 195.020 RSMo (1978). (All further references shall be to RSMo (1978) unless otherwise noted). The alleged offenses concerning promoting pornography in the second degree occurred on November 20, 1985 involving a maga-

zine entitled *The Wet Ones* (Count I); on June 29, 1985 involving a magazine entitled *A— F——ed* (Count II); and on August 23, 1984 involving a magazine the title of which remains undisclosed by the record (Count III). The alleged offense concerning possession of marijuana occurred on August 23, 1984 (Count IV). A substitute indictment replaced the original information filed for Counts III and IV.

No evidence was presented as to Counts III and IV. The trial court entered judgments of acquittal with respect to these counts with no objection being offered by the state. With regard to Counts I and II, the evidence adduced at trial consisted primarily of St. Louis City Police Detective McMiller's testimony that, on June 29, 1985 and November 20, 1985, while posing as a customer, he purchased certain magazines from defendant at Bobbie's Books, an adult book store located at 1309 Convention Plaza. Defendant presented no evidence. Further facts shall be enumerated as deemed necessary for the resolution of the points raised on appeal. Defendant's motion for judgments of acquittal as to Counts I and II was overruled, and defendant was found guilty and sentenced to 180 days imprisonment and fined $1000 on Count I and sentenced to one year imprisonment and fined $1000 on Count II. The execution of the sentence of one year imprisonment on Count II was suspended, and defendant was placed on two years probation.

On appeal, defendant contends that: (1) § 573.010, the statute defining "pornographic" as applied in § 573.030, the statute under which defendant was charged, tried, and convicted, is unconstitutional; (2) the trial court erroneously overruled his objections to the use of certain police reports by the state; and (3) the sentences imposed are excessive and constitute cruel and unusual punishment.

We transferred this case to our Supreme Court for a determination of defendant's first point on appeal challenging the constitutional validity of § 573.010. Specifically, defendant claimed that under the decisions in *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct.

1918, 95 L.Ed.2d 439 (1987) and *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the definition of "pornographic" embodied in § 573.010, as applied in § 573.030, was unconstitutional.

Section 573.010 contains the chapter definitions for pornography and related offenses. Section 573.010(1) provides:

*573.010. Chapter definitions*—As used in this chapter

(1) *"Pornographic"*, any material or performance is "pornographic" if, considered as a whole, applying contemporary community standards:

(a) Its predominant appeal is to prurient interest in sex; and

(b) It depicts or describes sexual conduct in a patently offensive way; and

(c) It lacks serious literary, artistic, political or scientific value.

In determining whether any material or performance is pornographic, it shall be judged with reference to its impact upon ordinary adults;

Promoting pornography in the second degree, § 573.030, the offense under which defendant was convicted, provides:

*573.030. Promoting pornography in the second degree*

1. A person commits the crime of promoting pornography in the second degree if, knowing its content and character, he:

(1) Promotes or possesses with the purpose to promote any pornographic material for pecuniary gain; or

(2) Produces, presents, directs or participates in any pornographic performance for pecuniary gain.

2. Promoting pornography in the second degree is a class A misdemeanor.

The definition of "pornographic" and the offense of promoting pornography in the second degree have been repealed by our legislature. Section 573.010(8) RSMo Supp. (1987), formerly § 573.010(1), now provides:

(8) *"Obscene"*, any material or performance is obscene if:

(a) Applying contemporary community standards, its predominant appeal is to prurient interest in sex; and

(b) Taken as a whole with the average person, applying contemporary community standards, it depicts or describes sexual conduct in a patently offensive way; and

(c) Taken as a whole, it lacks serious literary, artistic, political or scientific value. Obscenity shall be judged with reference to its impact upon ordinary adults;

Section 573.010(8) became effective by emergency act on July 15, 1987 in order to maintain state law in compliance with federal law. Also effective July 15, 1987, by the same act, is a new § 573.030 now providing:

*573.030. Promoting obscenity in the second degree*

1. A person commits the crime of promoting pornography for minors or obscenity in the second degree if, knowing its content or character, he:

(1) Promotes or possesses with the purpose to promote any obscene material for pecuniary gain; or

(2) Produces, presents, directs or participates in any obscene performance for pecuniary gain; or

(3) Promotes or possesses with the purpose to promote any material pornographic for minors for pecuniary gain; or

(4) Produces, presents, directs or participates in any performance pornographic for minors for pecuniary gain.

2. Promoting pornography for minors or obscenity in the second degree is a class A misdemeanor unless the person has pleaded guilty to or has been found guilty of an offense under this section committed at a different time, in which case it is a class D felony.

The United States Supreme Court, in *Miller*, delineated a tripartite test to be used in the determination of whether material is obscene. *Id.*, 93 S.Ct. at 2615[6–8]. The third prong of the *Miller* test requires the trier of fact to decide "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.*

In *Pope*, the Court was called upon to decide whether, in a prosecution for the sale of allegedly obscene materials, the jury may be instructed to apply community standards in deciding the value question embodied in the third prong of the *Miller* test. The Court reasoned, "[j]ust as the ideas a work represents need not obtain majority approval to merit protection, neither, insofar as the First Amendment is concerned, does the value of the work vary from community to community based on the degree of local acceptance it has won." *Pope*, 107 S.Ct. at 1921[1–3]. In finding the jury instruction at issue unconstitutional, the *Pope* Court concluded that "[t]he proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole." *Id.* (footnote omitted).

On transfer, our Supreme Court noted that facial invalidation of the repealed statute would not serve the purpose of preventing future prosecutions under a constitutionally defective standard. Defendant could still be retried, because he could not claim that the repealed statute failed to give him notice that the sale of obscene materials would be prosecuted. *State v. McKinney*, 756 S.W.2d 527, 529–30 (Mo. banc 1988).

Our Supreme Court, retransferring the cause to our court, concluded that:

In these circumstances, there is no reason to order retrials if it can be said beyond a reasonable doubt that the convictions in these cases were not affected by the erroneous wording of the statute. An otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.

*Id.* at 530[2] (citation omitted). Therefore, we must determine whether the constitutional error was harmless and review defendant's remaining points.

We shall direct our attention to defendant's second point, since it is dispositive of

this appeal. In this point, defendant contends that the trial court erred in overruling his objections to the use of certain police reports to refresh the recollections of St. Louis City Police Detectives Blanks on redirect examination and McMiller on direct examination. Defendant essentially argues that: (1) a proper foundation was not laid prior to the use of these reports; (2) when a witness testifies unhesitatingly on direct examination to certain facts, it is improper for the state to use a police report to ensure that the witness changes his testimony to supply different facts; and (3) even if a witness needs his memory refreshed, reading a writing prepared by someone else is improper unless the witness testifies that he knows the writing to be a correct statement of the facts. The state argues that defendant did not preserve this issue for appellate review due to lack of specific objections at trial and failure to file a motion for new trial. We find defendant's objections to be adequate and note that, "[i]n cases tried without a jury a motion for new trial is not necessary to preserve contentions for appellate review." *State v. Cole,* 706 S.W.2d 917, 918[1] (Mo. App.1986); Rule 29.11(e)(2)(A).

The crux of the charge against defendant was the promotion of pornographic materials for pecuniary gain. Therefore, it was incumbent upon the state to establish the sale of certain materials which were pornographic. At trial, the state presented two witnesses, Detectives Blanks and McMiller of the vice/narcotics division, to testify to the sale of magazines entitled *The Wet Ones* on November 20, 1985 (Count I) and *A— F——ed* on June 29, 1985 (Count II). On direct examination, Detective Blanks testified to the following events on November 20, 1985:

STATE: And on—On that date, did you have occasion to be working with Detectives Franklin and Douglas?

BLANKS: Correct.

STATE: Okay. And, during the course of your investigation, did you have occasion to conduct a surveillance at 1309 Convention Plaza?

BLANKS: I did.

STATE: And, while surveilling 1309 Convention Plaza—Well, excuse me. What, specifically, is at that address?

BLANKS: A bookstore.

STATE: And do you know the name of that bookstore offhand?

BLANKS: Bobby's [sic].

STATE: Okay. And had you conducted a surveillance of that location in the past?

BLANKS: Yes.

STATE: Okay. And, on that date in November, the 20th in particular, you were with Detectives Franklin and Douglas?

BLANKS: Correct.

STATE: And what, if anything, did you do, sir?

BLANKS: I was the—I remained in the vehicle while the buys were made, or the buy was made.

STATE: Okay. And who went into the store?

BLANKS: Detective Franklin.

\*  \*  \*  \*  \*  \*

STATE: Okay. And it was Detective Franklin, alone, who went into the store?

BLANKS: Yes.

STATE: Okay. And when Detective Franklin returned from the store, what, if any, items did he have?

BLANKS: He had a magazine.

STATE: Do you recall the magazine he had?

BLANKS: No, I do not.

STATE: Okay. Did you prepare a police report on that date, or did you participate in preparing a police report?

BLANKS: No. I didn't prepare the police report.

STATE: Okay. When he went into the store at 1309 Convention Plaza, did he have a magazine in his hands?

BLANKS: No, he did not.

STATE: Okay. I have no further questions, Your Honor.

On cross-examination, no mention of a Detective McMiller was made. On redirect examination, the following occurred:

STATE: Detective Franklin did not go into the store by himself. Wasn't it Detective McMiller that went into the store?

BLANKS: On the 20th?

STATE: On the 20th of November, '85? Were you working with Detective Larry McMiller, also, Detective Franklin, Blanks, and Douglas?

BLANKS: We were together on four or five different occasions that we went to the store.

STATE: The same store at 1309 Convention Plaza?

BLANKS: Convention Plaza.

STATE: Okay. Did you have occasion to review your police report that was prepared concerning the incident on the 20th of November? Before coming to court today, did you review your police report concerning the incident of the 20th of November?

BLANKS: Correct.

STATE: Okay. I'm going to hand you— Could I have this marked for identification purposes?

(The police report was marked State's Exhibit 1 for identification).

\* \* \* \* \* \*

COURT: What is the document?

STATE: It is a five-page police report prepared by a word processor. The investigating officers are McMiller and Blanks.

DEFENSE: Your Honor, let me object to [state's counsel] reading from that police report. I object further to him showing it to the witness. I—I can't understand what the purpose of it is, and I object that it is not competent testimony for him, at this point in time, after the officer testified in direct testimony that—apparently had no problem with what happened on the 20th of November until [state's counsel] is, on redirect, now asking him who might have been present and asking him whether or not he reviewed this police report. And I guess he now wants him to testify from the police report. I think that's totally improper.

STATE: Your Honor, I—It's a recollection refresher.

COURT: Well, okay. I—I'll overrule your objection at this time....

\* \* \* \* \* \*

COURT: What—What's the purpose for which you asked him to review his report?

STATE: There apparently seems to be some confusion as to who entered the store, Your Honor. The next witness will testify that he, in fact, entered the store; and he, in fact, is the one who purchased the merchandise.

COURT: Well, are you just asking to refresh his recollection?

STATE: That is correct, Your Honor.

COURT: All right. Fine. Your objection is overruled.

STATE: Thank you, Judge.

COURT: He—He can review his own report.

STATE: Have you had the opportunity to review that police report?

BLANKS: Correct.

STATE: Okay. And I'd ask you once again, who entered the store at 1309 Convention Plaza?

BLANKS: It was Detective McMiller.

On direct examination, Detective McMiller testified that he, posing as a customer, entered Bobbie's Bookstore at 1309 Convention Plaza on November 20, 1985. He browsed around, obtained change from defendant, who was the clerk, and viewed a mini-movie at the rear of the bookstore. He testified further:

STATE: Okay. And, after you viewed that film in the rear of 1309 Convention Plaza, what, if anything, did you then do?

MC MILLER: I returned to the bookstore area.

STATE: Okay.

MC MILLER: And browsed around and removed a book off the rack.

STATE: Okay. Do you recall the name of that book?

MC MILLER: The title of that book was called *A— Masters*. I took the book, and I took it to the service counter,

and I asked the clerk if the book contained—

STATE: Excuse me, please.

DEFENSE: What book are you talking about?

MC MILLER: A book called *A— Masters.*

STATE: Excuse me, Detective. You reviewed several reports prior to coming to court today?

MC MILLER: Yes.

\* \* \* \* \* \*

STATE: Would you have a report reflecting the 20th of November with you?

\* \* \* \* \* \*

STATE: Would you have a copy of that report? I would ask you to take a look at that report which is marked State's Exhibit 1 for identification. And I'd ask you to review that report.

COURT: [State's counsel], what's the purpose for having the witness review the report, to refresh his reco—

STATE: To refresh his recollection, Your Honor.

COURT: All right.

DEFENSE: There has been no indication that his memory needs any refreshing, Your Honor.

STATE: There has been to me, Your Honor, at this point. Thank you. All right. I'd ask you once again, Detective McMiller, did you obtain a book from the shelf?

MC MILLER: Yes, I did.

STATE: Do you recall, once again, the title of that book?

MC MILLER: Yes. It was called *Wet Ones.*

A similar pattern occurred when Detective McMiller testified as to the sale of a magazine entitled *A— F—ed* on June 29, 1985 (Count II). Detective McMiller testified that, on that date, he entered the bookstore, obtained change from the defendant, who was the clerk, then viewed a mini-movie at the rear of the bookstore and further:

MC MILLER: I went back into the bookstore area, and I browsed. And I obtained a book from one of the shelves called *A— F—ed.*

\* \* \* \* \* \*

STATE: I hand you what is marked as State's Exhibit No. 25 for identification. It's Complaint Number 86002794. It's a police report consisting of 1, 2, 3, 4, 5 pages. I would hand you that, and I would ask you, do you recognize that?

DEFENSE: Again, let the record show my objection to him using the police report for this purpose, Your Honor, without a proper foundation.

STATE: Refreshing his recollection, Your Honor.

COURT: Okay. I'll overrule the objection.

STATE: Okay. Do you recognize that?

MC MILLER: Yes.

STATE: Okay. And how do you recognize that, Detective?

MC MILLER: It's a police report I prepared.

STATE: All right. I would ask·you to review that police report briefly. And then I would ask you, once again, after viewing the mini-movie and browsing, did you then select a book?

MC MILLER: Yes, I did.

STATE: Okay. And, after reviewing the police report, does it refresh your recollection?

MC MILLER: Yes.

STATE: All right. And could you tell me what, if any, book did you pick from the racks?

MC MILLER: *A— Masters.*

STATE: *A— Masters* as opposed to *A— F—ed*?

MC MILLER: Right. There—There were two books that I selected.

STATE: Okay. *A— Masters* was the first book you picked up?

MC MILLER: Right.

\* \* \* \* \* \*

STATE: Okay. And what did you then do?

MC MILLER: I browsed through the books in front of the counter, and I selected one called *A— F——ed.*

\* \* \* \* \* \*

STATE: Okay. And did you then purchase that magazine?

MC MILLER: Yes, I did.

It is clear that the state was attempting to establish the purchase of certain magazines by Detective McMiller. The identity of the magazines and the purchase are crucial elements of a charge under § 573.030. *A— Masters* is not part of the record on appeal.

■ It is a well-settled rule that a witness, who does not recall or is uncertain about matters while testifying, may refresh his recollection by a writing prepared by the witness or known by him to be correct. *State ex rel. Pini v. Moreland,* 686 S.W.2d 499, 502[5, 6] (Mo.App.1984). "The foundation for use of a report to refresh recollection is that the witness must exhibit both a lack of present memory and the need for the aid of the writing for recall, before being allowed to refer to the writing." *Id.* "Generally speaking, the question of whether a witness may be allowed to refresh his recollection is a matter reposing in the discretion of the trial court, reviewable only for abuse.... However a sound discretion would ordinarily dictate that a witness should not be asked to refresh his recollection unless it is first shown that he needs the aid of a refreshing memorandum of some sort in order to recall the facts to his mind." *Voyles v. Columbia Terminals Co.,* 223 S.W.2d 870, 871–2[3–5] (Mo.App.1949) (citations omitted). "It consequently follows, therefore, that where a witness has testified positively and readily so as to indicate that his memory is not obscured, one may not be permitted, in the guise and on the pretext of refreshing the witness' recollection, to make use of a favorable memorandum with an actual view to contradicting the witness or inducing him to change his testimony." *Voyles,* 223 S.W.2d at 872[3–5]. Here, Detectives Blanks and McMiller testified clearly and unhesitatingly as to the events in question. The record does not exhibit a lack of present memory nor the need for the aid of a writing for recall before the witnesses were allowed to look at the police reports which were never admitted into evidence. The record is completely devoid of the evidentiary foundation required to permit the refreshing of the recollection of the witnesses. *State ex rel. Pini,* 686 S.W.2d at 502[5, 6]. Thus, we conclude that the trial court erred in permitting the use of the police reports without a proper foundation.

If the only error occurred with Detective Blanks, it would not be prejudicial, because Detective Blanks' testimony was merely cumulative. He testified essentially to the fact that Detective McMiller entered the bookstore on November 20, 1985. Detective McMiller, himself, stated that he entered the bookstore on that date.

■ However, error also lies in refreshing Detective McMiller's recollection as to both magazines (*The Wet Ones* and *A— F——ed*). Although reversal for evidentiary errors is rare in a court-tried case, the state may not use police reports, without laying the proper foundation, to refresh a witness' testimony. *See State ex rel. Pini,* 686 S.W.2d at 502[5, 6]. Thus, we are constrained to find that the trial court abused its discretion, and defendant was thereby prejudiced.

Therefore, we must reverse the convictions on Counts I and II and remand for a new trial. Every person, even an alleged purveyor of filth which tears at the moral fiber of our society, is entitled to the procedural protections of our justice system.

Since we are remanding for a retrial, we shall address defendant's remaining points on appeal. Defendant's first point on appeal challenges the constitutionality of § 573.010(1) as applied to § 573.030. In keeping with the mandate of our Supreme Court, the trial court will be required to determine whether the magazines are pornographic beyond a reasonable doubt, and whether the constitutional error was harmless.

The two magazines admitted into evidence are *The Wet Ones* and *A— F——ed.*

In describing the picture on the front cover of *The Wet Ones*, Detective McMiller stated, "[i]t's—It's got a guy. He's lying on his back on a bed. There's a female lying on top of this guy on her back, and he has his penis inserted into her vagina....There's a second lady who is sitting over the guy's face, and he—The guy apparently has his mouth on the lady's vagina." The back cover "has a guy seated on a sofa. There is a female seated on the guy. The guy's penis is inserted into the female's vagina. There is a second guy standing on the sofa with his leg on the rear, and he has his penis inserted into her mouth." In similar fashion, Detective McMiller described the front cover of *A—F—ed*, which contained three separate scenarios, stating, "[i]t shows a picture of a female has—And she has a penis inserted in her vagina and one in the anus. It has a picture of a female and a male. The male is seated in a chair. The female straddled the male, and the penis is inserted into the vagina. And it has a picture of a male lying on a couch with his penis apparently inserted into her vagina, the female on top of him, and a male on the back of her. And it appears she has semen flowing down her buttocks." As for the back cover, "[i]t shows a, gosh, a rear—apparently a female's rear end and a male's penis inserted into the rear end." These magazines have a list price of $25.00 a piece, but were sold at $20.00 (*The Wet Ones*) and $17.50 (*A— F—ed*).

Without continuing to delve into graphic detail, these magazines are replete with pictures of nude or partially nude men and women engaging in heterosexual and homosexual activities involving single and multiple partners. Acts of cunnilingus, fellatio, sodomy, vaginal and anal intercourse, and ejaculation abound focusing on the genitalia of the models. A review of this evidence leaves us with a firm conviction that, applying the "reasonable person" standard enunciated in *Pope*, the magazines are pornographic beyond a reasonable doubt. This material is devoid of serious literary, artistic, political, or scientific value. Inclusion of a representative reproduction of a portion of either magazine in this opinion would buttress our conclusion, however, we are constrained by the bounds of decency from so doing. Suffice it to say, as did Justice Stewart in *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793, 804 (1964) (Stewart, J., concurring) when defining hard-core pornography, "we know it when we see it."

In his final point, defendant contends that the sentences imposed are excessive and constitute cruel and unusual punishment in the circumstances of this case in that they are disproportionate to the offenses committed. A conviction under § 573.030 is punishable under §§ 558.011.-1(5) and 560.016. The sentences of 180 days imprisonment and $1000 on Count I and one year imprisonment and $1000 on Count II are within the range permitted under the statutes.

Punishment within the range prescribed by statute cannot be judged excessive. *See State v. Thomson*, 705 S.W.2d 38, 42[9] (Mo.App.1985); *State v. Repp*, 603 S.W.2d 569, 571[3–5] (Mo. banc 1980). Additionally, "a punishment within the statutory limits is not cruel and unusual unless it is so disproportionate so as to shock the moral sense of all reasonable men." *State v. Koonce*, 731 S.W.2d 431, 443[19] (Mo.App. 1987). In light of the fact that defendant admits in his brief to a prior conviction on a similar charge, we conclude that the sentences imposed in this case are not so disproportionate as to shock the moral sense of all reasonable persons.

Because the disposition of defendant's second point requires reversing the convictions on Counts I and II, we remand this case for a new trial, and direct the trial court to proceed in accordance with our Supreme Court's mandate in *State v. McKinney*, 756 S.W.2d at 530[2].

REVERSED AND REMANDED.

CRANDALL and GRIMM, JJ., concur.